I'd like to reserve two minutes for rebuttal, and I'll try and keep an eye on the clock. The agency committed multiple legal errors in this particular case requiring reversal and remand. I'll focus on two issues today. The Board's determination that Mr. Paniagua's family-particular social groups are not cognizable, and that substantial evidence does not support the agency's conclusion that Mr. Paniagua failed to establish a well-founded theory. Would you kind of speak a little bit more slowly? I'm having difficulty following you. Absolutely, Your Honor, and I'll try and get a little closer so you can hear me. The immigration judge explicitly found that family-particular social groups presented by the petitioner here were cognizable, but the Board reversed and blanketly rejected them based on language in the Attorney General's 2009 decision in LEA, which I'll refer to as LEA 2. Specifically citing to LEA 2, the Board states, In evaluating a cognizable particular social group based on family, the family unit must have some greater meaning in society, and the average family is unlikely to be so recognized. Our contention that the language cited here from LEA 2 is dicta. It was not binding, it's not the holding of LEA 2 as it was the Attorney General's extraneous comments, and not necessary to the ultimate disposition of LEA 2. In rejecting the petitioner's family group in this particular case, the Board elevated this dicta to apply a per se bar to cognizability of family-particular social groups. It was legal error for the Board to cite this dicta as the rule or the holding of LEA 2, and to use that to find that petitioner's family groups are not cognizable. Instead, the Board should have engaged in a case-by-case analysis of petitioner's particular social groups, as this Court has recently reaffirmed in Diaz-Renosa v. Barr. Even if the Court disagrees with us, however, and believes that this language cited by the Board from LEA 2 was not dicta, and in some way was a modification of the standard for determining cognizability of particular social groups, it's our contention that this modification should apply a heightened standard to family-particular social groups. This new interpretation should not warrant Chevron deference because it's an unreasonable interpretation as it represents a drastic departure from decades-long precedent recognizing family as a viable group. Specifically, the language of requiring that a family have greater meaning in society is what we believe is the departure. This departure from established precedent without explanation and rests on reasoning that cannot be squared with existing precedent of the agency and this Court. The Board has long recognized that kinship ties can be defining characteristics of particular social groups, and while the Board has refined its interpretation of particular social groups over the prior 25 years, it has consistently, explicitly found that family groups can be cognizable in particular social groups. This Court's precedent has also repeatedly held that family can be a prototypical social group in Rios v. Lynch and Lynn v. Ashcroft. That a family can be a particular social group had acquired a level of clarity before LEA 2. Yet the language of LEA 2 that a family must have greater meaning in society and societal import represents a sharp break from this decades-long recognition. Can I ask a question? Absolutely. Even if we assume that there is a cognizable family group, the evidence seems to show that similarly situated family members have remained in Mexico unharmed. What is your best-recorded evidence and best case for distinguishing the petitioner from the rest of his family who have stayed behind? That goes to the well-founded fear claim, Your Honor. Yes. To briefly do an intro to that, in the well-founded fear analysis conducted by the immigration judge in this particular case, we believe that there was also some legal errors supporting the conclusion that similarly situated individuals or family members remain unharmed. First, the immigration judge cites Tuzang, which is in fact a withholding of removal case. In asylum context, in order to show that a petitioner has met the well-founded fear standard, they must only show that there is a 10% chance that the persecution they fear will actually occur. But in withholding of removal, the standard is more likely than not. It's 51%. So by citing Tuzang, the immigration judge held the petitioner to a higher than 10% standard. And then secondly, in terms of the similarly situated family members, the immigration judge specifically ignored or misapprehended certain evidence in the record in order to come to that conclusion. Specifically, she states, there have been no threats against anyone in the family since his father's kidnapping in 2012. That's at the record of 82. But that statement directly contradicts the evidence in the record. So at 608 and 602, the petitioner's similarly situated siblings, Jose, Angel, and Jonathan, each describe how the family continued to receive threats after 2012. The stepmother at 429 and 430 also states that the family continued to receive threats after 2012. This is significant material evidence that was ignored or overlooked by the immigration judge in reaching that conclusion that similarly situated family members remain unharmed. It's our contention that it's highly persuasive dispositive evidence, but the agency failed to consider in making its finding around similarly situated family members and well-founded fear compels the contrary conclusion, that similarly situated family members indeed were threatened, indeed were harmed, and that supports the well-founded fear determination for petitioner. On this particular point, there's also this apprehension by the board or a reliance on a finding that was purportedly made by the immigration judge as to internal relocation that, in fact, does not exist in the record. But the immigration judge did not make a specific finding as to internal relocation, but the board cites to this, cites to a portion of the immigration judge's decision that does not discuss internal relocation, and the board assumes that a finding was made there to support its own conclusion that the immigration judge made a correct finding. Now, there's no finding in the record, in fact, but if the court believes that there is some language in the record... Cancel. I'm looking at the IJ's order at page 61 of the record, and the IJ says that respondent fails to explain how childhood visits to grandmother would impact how the cartel would view his familial status as an adult. This is especially relevant because he is not given a reasonable explanation for why he could not relocate to an area of Mexico outside of his father's family town or even that general region of Mexico. So they did talk about relocation in the IJ, but I guess my broader question is, which decision are we reviewing? Aren't we reviewing the BIA's decision here in any event and not the IJ's decision? We are, Your Honors. The court is looking to the board's decision, but where the board's decision assumes portions of the immigration judge's decision, then this court looks to the immigration judge's decision for the analysis and reasoning. That's not what happened in this particular BIA decision. It reviewed for clear error the factual findings of the IJ. Correct, Your Honor. And on this particular point, the board found that there was no clear error in the immigration judge's finding that petitioner could avoid harm by internally relocating. So it's our contention that that language by the immigration judge is not in fact an independent finding as to internal relocation. So the board's reliance on that was error because that finding does not exist in the record. The discussion by the immigration judge that the petitioner could, there was no reasonable explanation for why he could not relocate, is done in the context of her analysis around similarly situated individuals or family members. It's an extra comment describing how in rejecting Mr. Paniagua's argument that he'll face different treatment than his siblings if returned to Mexico. But it's our contention that it was not an independent finding. Even if the court believes that it were, or that the board does not assume that there was a finding made by the immigration judge, again, we believe that the board stepped outside of its role and made an independent factual finding on this particular issue of internal relocation. Because the immigration judge's language or comments around relocating dealt more with, in the context of her argument, about similarly situated family members. So because substantial evidence does not support the agency's finding that Mr. Paniagua failed to establish a well-founded fear, we believe that the court can reverse on that alone without the need to remand. But at the very least, the court should remand to the board to consider all of the evidence that we believe it failed to do, and to consider the petitioner's claims on evidence under the press scandal. We're not asking the court to second-guess the judgment of the board, but we are asking that the court help correct mistakes that are in the record. For that reason, the court should, at minimum, remand to the board to give it an opportunity to do so. If there are no more questions as to either the family group or the well-founded fear, I'd actually like to reserve the remaining time I have for you all. All right. Thank you. Ms. Yusuf? Yes. Good morning, Your Honors. Mona Yusuf for the Attorney General. I will first address counsel's argument that LEA somehow made a greater standard or a higher standard. I just want to address that very briefly. LEA, too, did not really come up with any type of revolutionary finding. It basically just told all applicants that they have to fulfill the social distinction and the particularity argument or requirements when they're trying to assert family group. The board—I'm sorry. I'm sorry. The Attorney General did not say family cannot ever be a particular social group or it's always a particular social group, just that an applicant has to meet their burden through particularity and social distinction. Now, counsel is referring to language on page 594 of the Attorney General's decision. That language is, but to qualify under the statute, when an applicant proposes a group composed of a specific family unit, he must show that his proposed group has some greater meaning in society, and then they go on to explain what that means. It is not enough that a family be set apart in the eye of the persecutor because it is the perception of the relevant society rather than the perception of the alien's actual or potential persecutors that matters. Now, that's something that has been long held by the board and it's been approved or given Chevron deference through Reyes. So that argument, there is no legal merit to that argument that somehow this alien was held to a higher standard. But in any event, there are three reasons why a petitioner's claim fails. And really what it comes down to is the facts of this case, which are relatively straightforward. Back 30 years ago, petitioner has not been with his father in Mexico for 30 years. His father left in 1991 for the United States. He left behind petitioner, his two younger siblings, and his mother. Petitioner's father started a new family in the United States, married, had two United States citizen children. Petitioner did follow his father in 2001 and may have lived with his father in the United States. His father subsequently was arrested by immigration authorities twice, was returned to Mexico 2004, again in 2006. When his father returned in 2006, he brought his two youngest sons with him along with his wife. At that point, he built a house and started some new businesses in Mexico. Then he became a target for criminals. It was basically an extortion case. For the following six years, from 2006 until 2012, his father, only when he was home, and his father apparently traveled extensively, only when he was in his home in Santa Ana Maria, or Santa Maria Ana, I apologize, did he receive threats through phone and on his doorstep, through notes, demanding money. In fact, petitioner said that every single threat they received was a demand for money. Then in 2012, as he was either leaving a bank after selling a truck, or he was picking up his paycheck, the record's unclear, he was kidnapped. There's no evidence that the kidnap was by the same people who threatened him. He managed to get away and he came back to the United States.  Naturally so, based on his father's past experiences of being extorted. But the problem here is that he failed to establish first that his family group proposal, his father's immediate family, is a particular social group. First of all, it's hard to tell based on this record what he means by his father's immediate family. As the court noted, he does have two half-brothers who apparently are now in the United States. He has his stepmother, but he also has his mother and his two full siblings from the first marriage. They remain in Mexico. He tries to say that they're really not part of the immediate family because he's had no contact with them. But there's really no... But again, if you have to explain it that way, it's not defined with particularity. And also, as to social distinction, it's a matter of how the country, if the country or your community perceives you as a family. In this case, he keeps saying that the cartel will be able to identify him as his father's son after they, quote, investigate. And he uses that word multiple times in his testimony, that they will investigate him, determine that he's his father's son, and then for some reason either... And then try to extort him, perhaps because they think he too may have money. But the fact that a cartel has to investigate does not establish that society will see them as a family or a family unit. But regardless, there's also the chain that there's no evidence at all that he would be harmed assuming that his family is a particular social group because of his membership in that particular social group. The record is riddled with evidence, and it's well known that in Mexico, the criminals use extortion. And crime is a large problem in Mexico. And they sometimes, cartels sometimes threaten families in order to compel their extortion victim to give in to their demands. Here, there is no evidence that anyone was actually ever harmed other than the father in this case. There is a claim that there were threats made, and actually the board did acknowledge that. Counsel had said that the immigration judge made a mistake and said that there was no harm afterwards. If you look on the first page of the board's decision at the very bottom, his father's other children and his wife continued to receive threats in his absence until the children returned to the United States. So if there was an error on the part of the IJ, the board did correct that. But again, in his own testimony, he testified several times saying that his brothers, either for his brother and sister from the first marriage, his half brothers from the second marriage, his grandmother, his two aunts on his father's side, his stepmother were never harmed. And you can find that testimony on page 143 as to his second wife, 145 as to his first wife, and pages 158 through 61 as to his grandmother, his aunts and his siblings. He affirmatively says that he has, let's see. No, they have never harmed her, referring to his grandmother. As to his siblings, no, not until this point. No, they haven't done anything to them. So based on that record, evidence does not compel a conclusion that the agency was wrong when they found no nexus. As to the relocation, I don't really understand the argument that he said that's not on the record. The IJ, as the court pointed out, specifically said this is especially relevant because he is not given a reasonable explanation for why he could not relocate to another area in Mexico outside of his family's hometown. I think that's pretty obvious that the IJ did make a relocation finding. And even if this court was to find that family was a social group, even if this court was to find that there was a well-founded fear on account of that membership, the claim fails for failing to provide evidence that it would be unreasonable for him to relocate. The only threats that they had were in his hometown, made specifically to his father. There's no evidence why this particular gentleman can't relocate outside of his hometown or his home state. I understand that crime is a problem in Mexico, but there's no evidence that the criminals here have any type of... He claims it's Bezaida's, Bezaida's apparently according to his own testimony, his expert testimony said that they're predominant in three out of the 31 states in Mexico. Petitioner was able to relocate to the United States. There's no reason to assume that he would not be able to relocate within Mexico. If there are any questions, I know that was kind of a long-winded statement. On the issue of relocation counsel, is the burden of proof on the petitioner or on the DHS? In this case, it would be on the petitioner because there was no evidence of past persecution and he never stated that he was persecuted in the past. Do you have a case that so says? Let me see. It's basically on the CFR 8, CFR 1208.13B3I. The applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate in the absence of past persecution. All right. Thank you, counsel. Thank you for your time. Thank you. Ms. Haley-Nelson. Thank you, your honors. To respond to a respondent's argument that this language from LEA-2 was not in any way different from existing analysis about cognizability of particular social groups. Again, the language that a family must show greater meaning in society is in fact distinct from the application of usual social distinction analysis to particular social groups and family particular social groups in the past. And in this particular case, the board applied that language, that specific language that a family needs show greater meaning in society to petitioner's family groups as a push me bar to cognizability. The board states at four of the record, the petitioner has not established how his family unit would be viewed with the requisite social distinction and particularity to constitute a social group and cites to the language from LEA-2 about greater meaning in society without any discussion of the record evidence or without any further analysis. This is a per se bar by citing to that language. And the board goes on to state that because the proposed particular social groups are not cognizable, petitioner is unable to meet his burden to show that it's a protected ground, is a central reason for asylum or a reason for withholding. That language, greater meaning in society is an attempt to change the social distinction analysis. It's an attempt to equate social distinction with fame rather than recognition. And a group can be recognized in society without necessarily being famous. And I'd like to offer the court with an example to illustrate the point as it relates to families. Same-sex couples with children is a distinct family group. In societies around the world, these groups are identified through various laws that control or detail the forming, the recognition, and the treatment of these families. They are identified as distinct within their societies based on their family structures, and they are viewed as distinct based on a collection of the society in questions, political, cultural, and religious beliefs. Yet these families don't necessarily need to be famous to be recognized as a distinct group. They don't necessarily need to be headed by a famous individual necessarily to be recognized in society. That's the distinction, the change that we believe LEA-2 is proposing, that in order to meet social distinction now, henceforth, a family must show that it is well-known or famous in society rather than just being recognized in society. But again, as to our particular case, the board applied this language, greater meaning in society language from LEA-2, as a per se bar to petitioners' family groups without analysis and without discussion. The board should have engaged in a case-by-case analysis. As to the internal relocation argument, in this particular case, internal relocation is a two-fold analysis. We must show first that the petitioner is not safe for them to relocate and that it's not reasonable under all the circumstances. I would point out to the court the recent precedent, Accuson v. Barr, that held the ability to relocate for a petitioner in terms of asylum cannot reasonably include being forced to live in hiding, which is essentially what the petitioner said he would have to do in order to internally relocate. There is, in fact, quite a bit of evidence in the record that the petitioner could not relocate safely nor reasonably under all the circumstances. At 163 and 169, there's testimony that the existence of this FS cartel is countrywide. The expert provides testimony at 191 of the record that internal relocation is not safe nor reasonable for this petitioner. The expert's affidavit at 445 of the record is that this can easily locate the petitioner wherever in Mexico, making it difficult and unsafe for the petitioner to relocate internally, in addition to multiple country conditions evidence. I realize that my time has expired, so unless there are further questions, we ask for your support, grant the petition, and we demand for the court's support. All right. Thank you, Council. This case will be submitted. And we will take up our last case for oral argument today, Safeway versus the NLRB.
judges: Wardlaw, Bea, Rosenthal